IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Plaintiff/Appellee,<br><br>    vs.<br><br>DONALD J. TRUMP, President of the United States; et al.,<br><br>    Defendants/Appellants. | No. 17-17478<br><br>U.S. District Court, Northern District, Case No. 3:17-cv-00485-WHO |
| COUNTY OF SANTA CLARA,<br><br>    Plaintiff/Appellee,<br><br>    vs.<br><br>DONALD J. TRUMP, President of the United States; et al.,<br><br>    Defendants/Appellants. | No. 17-17480<br><br>U.S. District Court, Northern District, Case No. 3:17-cv-00574-WHO |

---

**CITY AND COUNTY OF SAN FRANCISCO'S
ANSWERING BRIEF**

---

On Appeal from the United States District Court
for the Northern District of California

The Honorable William H. Orrick

DENNIS J. HERRERA, State Bar #139669
  City Attorney
JESSE C. SMITH, State Bar #122517
RONALD P. FLYNN, State Bar #184186
YVONNE R. MERÉ, State Bar #173594
CHRISTINE VAN AKEN, State Bar #241755
  Deputy City Attorneys

Office of the San Francisco City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone: (415) 554-4748
Facsimile:  (415) 554-4715
E-Mail:  brittany.feitelberg@sfcityatty.org

Attorneys for Plaintiff and Appellee
CITY AND COUNTY OF SAN FRANCISCO

Additional Counsel for Plaintiff and Appellee
CITY AND COUNTY OF SAN FRANCISCO

TARA M. STEELEY, State Bar #231775
MOLLIE M. LEE, State Bar #251404
SARA J. EISENBERG, State Bar #269303
AILEEN M. McGRATH, State Bar #280846
MATTHEW S. LEE, State Bar #295247
NEHA GUPTA, State Bar #308864

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

ISSUES PRESENTED ......................................................................... 1

STATEMENT OF THE CASE ............................................................... 1

    I.     San Francisco's Laws And Policies ..................................... 1

    II.    The Executive Order ........................................................ 3

    III.   San Francisco's Lawsuit ................................................... 5

STANDARD OF REVIEW .................................................................. 9

ARGUMENT ...................................................................................... 9

    I.     The Executive Order Unlawfully Threatens San Francisco And Other Jurisdictions With The Loss Of Federal Funds .......................... 9

         A.    The Plain Text Of The Order And The President's And His Administration's Statements Make Clear That The Order Directs The Defunding Of Sanctuary Jurisdictions .......... 9

         B.    The Executive Order Is Unlawful. ............................... 16

         C.    Because The Order Directs Executive Agencies To Take Action Against Cities Like San Francisco, San Francisco's Claims Challenging It Are Justiciable ................... 21

    II.    The Attorney General's Post-Litigation Memorandum Does Not Save The Order ........................................................... 23

    III.   The District Court Did Not Abuse Its Discretion In Ordering Relief. ............................................................................ 27

         A.    San Francisco Satisfies The Permanent Injunction Factors. ....................................................................... 27

         B.    The District Court Did Not Abuse Its Discretion In Issuing Nationwide Relief ............................................ 29

CONCLUSION ................................................................................. 35

STATEMENT OF RELATED CASES ................................................ 37

CERTIFICATE OF COMPLIANCE ................................................... 37

ADDENDUM OF PERTINENT ENACTMENTS ......................... ADD 1

I.      U.S. Constitution, art. I, § 8 (excerpt) ......................................... ADD 1

II.     U.S. Constitution, amend. IV ...................................................... ADD 1

III.    8 U.S.C. § 1357 (excerpt) ............................................................ ADD 1

IV.     8 U.S.C. § 1373. ........................................................................ ADD 4

V.      8 C.F.R. § 287.8 (excerpt) .......................................................... ADD 4

VI.     San Francisco Administrative Code, Excerpts of Chapter 12H.:
        Immigration Status ..................................................................... ADD 5

VII.    San Francisco Administrative Code, Excerpts of Chapter 12I:
        Civil Immigration Detainers ....................................................... ADD 7

CERTIFICATE OF SERVICE ............................................................... 38

# TABLE OF AUTHORITIES

**Federal Cases**

*Adarand Constructors, Inc. v. Slater*
528 U.S. 216 (2000) ...........................................................................23

*Alvarez v. Smith*
558 U.S. 87 (2009) ............................................................................32

*Arizona v. United States*
567 U.S. 387 (2012) ...........................................................................20

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*
512 U.S. 298 (1994) ................................................................. 11, 12, 13

*Bassidji v. Goe*
413 F.3d 928 (9th Cir. 2005) ...............................................................11

*Bell v. City of Boise*
709 F.3d 890 (9th Cir. 2013) ...............................................................24

*Bresgal v. Brock*
843 F.2d 1163 (9th Cir. 1987) .......................................... 29, 30, 32, 34

*Building & Constr. Trades Dept. v. Allbaugh*
295 F.3d 28 (D.C. Cir. 2002) ...............................................................14

*Califano v. Yamasaki*
442 U.S. 682 (1979) .................................................................. 30, 34

*City of Lakewood v. Plain Dealer Pub. Co.*
486 U.S. 750 (1988) ...........................................................................27

*City of Los Angeles v. Patel*
135 S.Ct. 2443 (2015) ........................................................................26

*Clinton v. City of New York*
524 U.S. 417 (1998) ...........................................................................16

*Cole v. Young*
351 U.S. 536 (1956) ...........................................................................12

*Doe v. Rumsfeld*
  341 F.Supp.2d 1 (D.D.C. 2004) ........................................................31

*Eastman Kodak Co. v. Image Tech. Servs.*
  504 U.S. 451 (1992) ........................................................9

*eBay Inc. v. MercExchange, L.L.C.*
  547 U.S. 388 (2006) ........................................................27

*Elrod v. Burns*
  427 U.S. 347 (1976) ........................................................28

*Evans v. Harnett Cty. Bd. of Educ.*
  684 F.2d 304 (4th Cir. 1982) ........................................................30

*F.C.C. v. Fox Tel. Stations, Inc.*
  566 U.S. 502 (2009) ........................................................15

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*
  528 U.S. 167 (2000) ........................................................32

*Galarza v. Szalczyk*
  745 F.3d 634 (3d Cir. 2014) ........................................................3

*Golden v. Wash.*
  138 S.Ct. 448 (2017) ........................................................3

*Gregory v. Litton Sys., Inc.*
  472 F.2d 631 (9th Cir. 1972) ........................................................31

*Harmon v. Thornburgh*
  878 F.2d 484 (D.C. Cir. 1989) ........................................................30

*Hawaii v. Trump*
  878 F.3d 662 (9th Cir. 2017),
  *cert. granted*, No. 17-965 (U.S. Jan. 19, 2018) ........................ 15, 28, 30

*Hills v. Gautreax*
  425 U.S. 284 (1976) ........................................................32

*INS v. Chadha*
  462 U.S. 919 (1983) ........................................................15

*Int'l Refugee Assistance Project v. Trump*
857 F.3d 554 (4th Cir.),
*vacated as moot*, 138 S. Ct. 353 (2017) .............................................................12

*Islamic Republic of Iran v. Boeing Co.*
771 F.2d 1279 (9th Cir. 1985) ..........................................................................11

*Lawrence Cty. v. Lead-Deadwood Sch. Dist. No. 40-1*
469 U.S. 256 (1985) .........................................................................................19

*Los Angeles Haven Hospice, Inc. v. Sebelius*
638 F.3d 644 (9th Cir. 2011) ........................................................................ 9, 34

*Lujan v. Nat. Wildlife Fed.*
497 U.S. 871 (1990) ................................................................................... 31, 34

*M.R. v. Bd. of Sch. Comms. of Mobile Cnty.*
286 F.R.D. 510 (S.D. Ala. 2012)........................................................................31

*McCormack v. Herzog*
788 F.3d 1017 (9th Cir. 2015) ...........................................................................23

*Melendres v. Arpaio*
695 F.3d 990 (9th Cir. 2012) .................................................................. 28, 29, 32

*Mendia v. Garcia*
165 F.Supp.3d 861 (N.D. Cal. 2016)..................................................................20

*Monsanto Co. v. Geertsen Seed Farms*
561 U.S. 139 (2010) .........................................................................................32

*Morales v. Chadbourne*
793 F.3d 208 (1st Cir. 2015) .............................................................................19

*Nat. Fed. of Indep. Bus. v. Sebelius*,
32 S.Ct. 2566 (2012) .................................................................................. 17, 19

*Nat. Mining Assn. v. U.S. Army Corps of Engineers*
145 F.3d 1399 (D.C. Cir. 1998) .................................................................... 30, 34

*Native Village of Noatak v. Blatchford*
38 F.3d 1505 (9th Cir.) .....................................................................................24

*New York v. United States*, 505 U.S. 144, 161 (1992);.............................. 17, 18, 19

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*
676 F.3d 829 (9th Cir. 2012) ...............................................................22

*Olagues v. Russoniello*
770 F.2d 791 (9th Cir. 1985) ...............................................................24

*Old Dominion Branch No. 496, Nat. Assn. of Letter Carriers, AFL-CIO v. Austin*
418 U.S. 264 (1974) ...........................................................................11

*Orellana v. Nobles County*
230 F.Supp.3d 934 (D. Minn. 2017) ...................................................20

*Pennhurst State Sch. & Hosp. v. Halderman*
451 U.S. 1 (1981) ...................................................................... 18, 26

*Rattlesnake Coal. v. U.S. E.P.A.*
509 F.3d 1095 (9th Cir. 2007) .............................................................21

*Sharp v. Weston*
233 F.3d 1166 (9th Cir. 2000) .............................................................29

*South Dakota v. Dole*
483 U.S. 203 (1987) ..................................................... 16, 17, 19, 20

*Summers v. Earth Island Institute*
555 U.S. 488 (2009) ...........................................................................32

*Susan B. Anthony List v. Driehaus*
134 S.Ct. 2334 (2014) ........................................................................22

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*
402 U.S. 1 (U.S. 1971) .......................................................................33

*Texas v. United States*
809 F.3d 134 (5th Cir. 2015),
*aff'd by an equally divided court* 136 S. Ct. 2271 (2016) ............................ 28, 30

*Thomas v. Anchorage Equal Rights Comm.*
220 F.3d 1134 (9th Cir. 2000) .................................................... 21, 22

*Train v. City of New York*
  420 U.S. 35 (1975) ........................................................................16

*Trulillo-Santoyo v. United States*
  No. 5:16-CV-855-OLG, 2017 WL 2896021 (W.D. Tex. June 5, 2017)..............20

*United States v. Nosal*
  676 F.3d 854 (9th Cir. 2012) ............................................................27

*United States v. Stevens*
  559 U.S. 460 (2010) ......................................................................27

*United States v. W. T. Grant Co*
  345 U.S. 629 (1953) ......................................................................23

*Washington v. Trump*
  847 F.3d 1151 (9th Cir. 2017) ................................................... 3, 11, 30

*Whitman v. Am. Trucking Assns.*
  531 U.S. 457 (2001) ......................................................................27

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*
  636 F.3d 874 (7th Cir. 2011) ..................................................... 30, 33

*Zepeda v. U.S. Immigration & Naturalization Service*
  753 F.2d 719 (9th Cir. 1983) ............................................................32

*Zivotofsky ex rel. Zivotofsky v. Kerry*
  135 S.Ct. 2076 (2015) ....................................................................17

**Constitutional Provisions**
U.S. Const., Amend. X .......................................................... 6, 16, 17

U.S. Const. art. I, § 8, cl. 1...........................................................16

U.S. Const., art. III................................................21, 29, 30, 32

**Federal Statutes**
8 U.S.C. § 1357...........................................................................20

8 U.S.C. §§ 1373. ...................................................................*passim*

42 U.S.C. §§ 5121, *et seq*..............................................................19

**Regulations**

8 C.F.R. § 287.7(a)..................................................................3

8 C.F.R. § 287.7(d) ................................................................3

8 C.F.R. § 287.8(c)(2)(i) ........................................................20

**Rules**

Fed. R. App. P. 28(a)(8)(A) ..................................................21

Fed. R. Civ. P. 23(b)(2)..........................................................31

**San Francisco Statutes, Codes & Ordinances**

S.F. Admin. Code § 12H.1 ......................................................1

S.F. Admin. Code § 12H.2 ..................................................1, 2

S.F. Admin. Code § 12I.1 .....................................................1, 2

S.F. Admin. Code § 12I.3 .....................................................2, 6

S.F. Admin. Code § 12I.4 .........................................................2

**Other Authorities**

Executive Order 13,768, 82 Fed. Reg. 8,799 (Jan. 25, 2017) ("Enhancing Public Safety in the Interior of the United States")................................. *passim*

82 Fed. Reg. 8799, § 2 ............................................................3

82 Fed. Reg. 8799, § 2(c)................................................... 9, 13

82 Fed. Reg. 8799, § 9(a)..................................................... *passim*

82 Fed. Reg. 8799, § 9(b) ....................................... 4, 10, 13, 18

82 Fed. Reg. 8799, § 9(c)...................................... 4, 9, 10, 16, 18

Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016), available at
https://www.congress.gov/bill/114th-congress/senate-bill/3100/text ..................17

Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015),
available at https://www.congress.gov/bill/114th-congress/senate-bill/2146......17

# ISSUES PRESENTED

The President issued an Executive Order that directs the Attorney General and Secretary of Homeland Security to deny federal grant funding to sanctuary cities except as those officials deem necessary for law enforcement purposes, and regardless of whether Congress has given the executive branch any authority to add conditions to any particular grant awards. Although the Executive Order's language qualifies its directives with boilerplate exceptions for where the law requires otherwise, the President has consistently expressed his intent to use federal funding as a coercive tool to force sanctuary cities to renounce their policies, and other federal officials have expressed the same unlawful intent. The issues presented are:

1.     Whether the executive branch, pursuant to the Executive Order, may deny federal grant funding to sanctuary cities; and

2.     Whether the district court abused its discretion in enjoining the Attorney General and Secretary from enforcing the contested section of the Executive Order while leaving intact their existing ability to impose congressionally authorized conditions on federal grant funds.

# STATEMENT OF THE CASE

## I.     San Francisco's Laws And Policies

San Francisco, a city of immigrants, has a reputation for tolerance and diversity that has attracted residents and visitors from around the world. To promote cooperation and trust with its immigrant community, San Francisco has declared itself a city of refuge. S.F. Admin. Code §§ 12H.1, 12I.1 (Addendum 5-17). San Francisco prohibits its employees from using City funds or resources to assist federal officials in enforcing immigration laws except where required by

law.  *Id.* §§ 12H.2; 12I.1.  It specifically prohibits its employees from informing federal officials about when the people who are detained in its jails will be released except in narrow circumstances, *id.* §§ 12H.2, 12I.3, and it does not permit its law enforcement officers to hold people in jail past their ordinary release dates based on a request by Immigration and Customs Enforcement (ICE) to detain a removable individual, *id.* § 12I.3.  But it permits its law enforcement officers to collaborate with federal officials as the City deems worthwhile to protect public safety.  *Id.* § 12I.4.  These policies reflect San Francisco's legislative judgment that its immigrant residents are more likely to report crimes, use public services, and participate fully in the life of the community when they do not fear that contact with local officials will result in deportation for them or their family members.  *Id.* § 12I.1.  The policies also conserve scarce local resources by using law enforcement personnel only for local public safety priorities and not to carry out the federal government's priorities for immigration enforcement.  *Id.* ("The federal government should not shift the financial burden of federal civil immigration enforcement, including personnel time and costs relating to notification and detention, onto local law enforcement . . . .").

San Francisco's sanctuary policies do not violate federal immigration law. Federal law forbids cities from restricting their officials from communicating with ICE or other government entities about the citizenship or immigration status of any individual, and it forbids them from placing restrictions on maintaining information regarding citizenship or immigration status.  8 U.S.C. § 1373(a), (b). San Francisco's codes contain no prohibition on communicating with ICE about citizenship or immigration status.  They restrict only the communication of release status and personal identifying information, S.F. Admin. Code §§ 12H.2; 12I.2

(defining personal information), and San Francisco has informed its employees of the provisions of § 1373, SER 268-69.

Nor does San Francisco violate federal immigration law by enacting a local law prohibiting its officials from honoring ICE's requests to detain individuals that ICE believes are removable. ICE has the regulatory authority to issue notice to other law enforcement agencies that it "seeks custody of an alien presently in the custody of that agency," and to request that the agency keep the person in custody for 48 hours after she is eligible for release to enable ICE to take custody for the purpose of arresting and removing the person. 8 C.F.R. § 287.7(a), (d). But these so-called "detainers" are merely requests. A Department of Justice report issued in May 2016 on potential violations of § 1373 indicated that ICE considers its detainers to be "voluntary" and "not enforceable against jurisdictions which do not comply." SER 163; *see also Galarza v. Szalczyk*, 745 F.3d 634, 640 (3d Cir. 2014) (all federal appellate courts to have considered the question have held detainers voluntary).

## II.    The Executive Order

On January 20, 2017, Donald J. Trump was inaugurated President of the United States after campaigning as a hardliner on immigration issues. Just five days later, and two days before banning individuals from seven Muslim-majority countries from entering the United States,[1] the President issued an executive order concerning immigration enforcement. Entitled "Enhancing Public Safety in the Interior of the United States," Executive Order No. 13,768 sets out a broad executive branch policy to, among other things, withdraw federal funding from so-

---

[1] *See Washington v. Trump*, 847 F.3d 1151, 1156 (9th Cir. 2017), *cert. denied sub nom. Golden v. Wash.*, 138 S. Ct. 448 (2017).

called "sanctuary jurisdictions" "except as mandated by law." ER 187 (Order, § 2).

To carry out its aims, the Order instructs the Attorney General and the Secretary of Homeland Security to deny federal grants to sanctuary jurisdictions "except as deemed necessary for law enforcement purposes." The Order does not identify which grants that the Attorney General and Secretary are to withhold from sanctuary jurisdictions; instead it instructs the Director of the Office of Management and Budget to identify "*all* Federal grant money that is currently received by any sanctuary jurisdiction." ER 189 (Order, § 9(c)) (emphasis added). Nor does the Order set out a single definition of sanctuary jurisdictions. Instead it identifies them in three ways: (1) in § 9(a), it identifies them as jurisdictions "that willfully refuse to comply with 8 U.S.C. 1373"; (2) "or" as jurisdictions that have "in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law"; and (3) in § 9(b) it identifies them as jurisdictions that have "ignored or otherwise failed to honor any detainers with respect to . . . aliens."

A few days after issuing the Executive Order with a penstroke, the President gave a statement about sanctuary cities. He told an interviewer that "defunding" is a "weapon" against sanctuary jurisdictions, stating, "I don't want to defund anybody. I want to give them the money they need to properly operate as a city or a state. If they're going to have sanctuary cities, we may have to do that. Certainly that would be a weapon." SER 229. The President's press secretary also announced the order, telling the press that the President would "make sure that cities who don't comply with it – counties and other institutions that remain sanctuary cities don't get federal government funding in compliance with the executive order." SER 243. The White House also issued a statement that "President Trump is committed to . . . ending sanctuary cities . . . ." SER 155.

The day after the President issued the Order, the Mayor of the City of Miami directed his corrections department director to honor ICE detainer requests "[i]n light of the provisions of the Executive Order." SER 238.

## III.    San Francisco's Lawsuit

In the 2017-18 fiscal year, San Francisco expects to receive about one billion dollars in federal grants and one billion dollars in annual entitlement payments. SER 57. These funds pay for core services like medical care, social services, public infrastructure projects; and public safety. SER 49-55. Losing these funds would be catastrophic, especially for some of San Francisco's most vulnerable residents who receive medical and social services from federal funds, and would force San Francisco to dramatically shift its spending and struggle to maintain services. SER 57, 273-74. In light of these potentially devastating consequences, San Francisco took immediate action: It shifted money from its budget into a reserve to account for the possibility of lost federal funding because of the Order. SER 293.

But no reserve could fully protect San Francisco from the risk posed by the Executive Order and the President's threats to use defunding as a weapon to "end[]" sanctuary cities. SER 155, 229. San Francisco accordingly filed suit on January 31, 2017 against the President, the United States, the Attorney General, and the Secretary of Homeland Security, seeking declaratory and injunctive relief that § 9(a) of the Executive Order is unlawful and cannot be enforced. San Francisco sought a preliminary injunction soon after. ER 235. In opposing the preliminary injunction, the Administration took the position for the first time at oral argument on the motion that "the Order is merely an exercise of the President's 'bully pulpit' " to urge sanctuary jurisdictions to change their policies.

ER 53. According to the Administration's position at oral argument, the only application of § 9(a) of the Order was to three federal grants administered by the Justice and Homeland Security Departments that already included grant conditions requiring grantees to comply with 8 U.S.C. § 1373, and these conditions were authorized by existing law even absent the Order. ER 53.

The district court rejected this interpretation as an implausible reading of the Order that was further belied by the Administration's public statements. ER 54. Reading the plain text of the Order, the district court found that it exceeded the President's powers to impose funding conditions on money appropriated by Congress; that it violated the Spending Clause for the President to impose new and coercive conditions on the receipt of federal funds; and that it violated the Tenth Amendment for the federal government to coerce local jurisdictions to honor detainers. ER 78-85. The court issued a preliminary injunction enjoining all defendants except the President from enforcing § 9(a) anywhere in the nation, in light of its finding that the Order affected all jurisdictions in the same unconstitutional manner. ER 100.

On May 22, 2017, the Attorney General issued a two-page "Memorandum for All Department Grant-Making Components" whose subject was "Implementation of Executive Order 13768, 'Enhancing Public Safety in the Interior of the United States.'" ER 184. In the Memorandum, the Attorney General stated that he had determined that "section 9(a) of the Executive Order, which is directed to the Attorney General and the Secretary of Homeland Security, will be applied solely to federal grants administered by the Department of Justice or the Department of Homeland Security, and not to other sources of federal funding." ER 184. The Memorandum stated that, consistent with the Order and with statutory authority and past practices, the Justice Department would require

jurisdictions applying for certain federal grants from the Department to certify that they complied with § 1373. ER 185. This condition was already required for some grants, and the Department would apply it to future grants "for which the Department is statutorily authorized to impose such a condition." ER 185. The Memorandum also stated that "sanctuary jurisdiction" for purposes of the Order would "refer only to jurisdictions that 'willfully refuse to comply with 8 U.S.C. 1373.' " ER 185.

According to the Memorandum, then, federal funds would be withheld only from jurisdictions that willfully had a law or policy prohibiting employees from communicating with ICE regarding citizenship or immigration status. Notwithstanding the Memorandum, however, the Attorney General has—before and after issuing the Memorandum—made public statements expressing a much broader view. In a public statement made on March 27, 2017, from the White House rather than from the Justice Department briefing room, the Attorney General said that some cities "have adopted policies designed to frustrate the enforcement of our immigration laws. This includes refusing to detain known felons under federal detainer requests, . . ." SER 19-20, 234. He said that "these policies . . . violate federal law" according to a May 2016 Justice Department Office of the Inspector General Report. SER 235. That report concerned detainer requests, and raised a concern that local no-detainer policies would lead employees to believe they also could not communicate with ICE about immigration status, which the report identified as inconsistent with the intent of § 1373. SER 165-66. As recently as August 2017, the Attorney General has continued to cite policies against honoring detainers as examples of unlawful sanctuary policies. SER 264-65.

Nor was the Attorney General alone in stating that local policies not to honor detainer requests would subject sanctuary cities to defunding. In a statement in response to the district court's order, the White House said that "[s]anctuary cities, like San Francisco, block their jails from turning over criminal aliens to Federal authorities for deportation." SER 157. Citing the tragic death of Kate Steinle, the official White House statement said that the San Francisco officials responsible for its policies "have the blood of dead Americans on their hands." SER 158. And in sworn testimony before Congress in June 2017, a month after the district court enjoined § 9(a), the Acting Director of ICE was asked "[u]nder the president's executive order," how many jurisdictions "are in violation of 1373 that would no longer be eligible for federal law enforcement grants or homeland security grants." SER 209. The Director responded, "I think it's well over 100 that have some sort of policy where they don't honor detainers or allow us access to the jails." SER 210.

In light of the Memorandum, the Administration sought reconsideration of the district court's preliminary injunction order, claiming that the Memorandum definitively interpreted the Executive Order in a constitutional fashion. The district court denied the request, finding that the Memorandum was not a persuasive interpretation of the Executive Order and did not bind any federal department to implementing the Order narrowly. ER 37-45. The court clarified, however, that its preliminary injunction did not "address or enjoin any other independent authority that may allow the government to impose grant conditions on funds." ER 32 n.1.

San Francisco moved for summary judgment in August 2017.

The district court granted its motion on November 20, 2017, adopting the same reasoning set out in its preliminary injunction order and its reconsideration

denial.  ER 5.  The court permanently enjoined all defendants except the President from enforcing § 9(a) in any respect.  ER 31.  This appeal followed.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *See, e.g., Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 465 n.10 (1992).  It reviews the district court's order of injunctive relief for abuse of discretion.  *See Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 654 (9th Cir. 2011).

## ARGUMENT

**I.  The Executive Order Unlawfully Threatens San Francisco And Other Jurisdictions With The Loss Of Federal Funds.**

**A.  The Plain Text Of The Order And The President's And His Administration's Statements Make Clear That The Order Directs The Defunding Of Sanctuary Jurisdictions.**

1.  The Executive Order broadly directs a full-enforcement immigration policy and identifies resources and methods to achieve it.  As to sanctuary cities, the Order declares the policy of the executive branch to deny them federal funds to the extent permitted by law.  ER 187 (Order, § 2(c)).

More specifically, in the section of the Order devoted to sanctuary cities, the Order states that "the Attorney General and the Secretary [of Homeland Security], in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes . . . ."  ER 189 (Order, § 9(a)).  In the same section of the Order, apparently to facilitate the Order's defunding aims, the Director of the Office of Management and Budget is directed to identify "*all* Federal grant

money that ***currently*** is received by any sanctuary jurisdiction." *Id.* (Order, § 9(c))

(emphasis added).  And while the Order does not fully define sanctuary

jurisdictions, instead leaving it to the Secretary "in his discretion" to designate

sanctuary jurisdictions, *id.* (Order, § 9(a)), it offers three ways to identify a

sanctuary jurisdiction: (1) "any entity that violates 8 U.S.C. 1373, [(2)] ***or*** which

has in effect a statute, policy, or practice that prevents or hinders the enforcement

of Federal law," *id.* (Order, § 9(a) (emphasis added)), or (3) which "ignored or

otherwise failed to honor any detainers with respect to . . . aliens," *id.* (Order,

§ 9(b) (commanding Secretary to "inform the public regarding public safety threats

associated with sanctuary jurisdictions" by compiling a list of jurisdictions that

have not honored detainer requests)).

Read in context, the plain text of Executive Order 13,678 commands the

Attorney General and Secretary to strip federal funding, apparently including

"current[]" Federal grant money, Order, § 9(c), from cities that "hinder[]"

enforcement of federal immigration law, including but not limited to cities that do

not comply with ICE's detainer requests or do not comply with § 1373.

In case the text of the Order was not plain, the President has spelled out

precisely what consequence he would inflict on sanctuary cities like San Francisco:

coerce them into rescinding their sanctuary policies by denying federal funding as

a "weapon."  SER 229; *see also supra* at 4.[2]  The White House has also continued

to issue statements about the Order indicating that, in its view, San Francisco is a

---

[2] While the City does not rely for this argument on pre-inaugural statements,
the President's statements on the campaign trail are consistent with his post-
election statements, and the White House has reaffirmed the candidate's campaign
promises.  See SER 8 (candidate Trump statement that "[w]e will end the
Sanctuary Cities that have resulted in so many needless deaths. Cities that refuse to
cooperate with federal authorities will not receive taxpayer dollars"); SER 152
(White House statement citing campaign statements, including the promise to
"end" sanctuary cities).

sanctuary jurisdiction because of its alleged noncompliance with § 1373 and specifically because it does not honor detainer requests. SER 157-58. The Attorney General's comments, notwithstanding his Memorandum (which does not mention detainer requests), make equally plain his view that the Order permits him to defund jurisdictions that do not honor detainer requests. *Supra* at 7. And the Acting Director of ICE has said that under the Order jurisdictions that do not honor detainers and that restrict access to local jails are not eligible to receive Justice or Homeland Security Department funding. *Supra* at 8.

2. The Administration's contrary arguments about the meaning of the Executive Order rest on a distorted reading that ignores swaths of the Order's plain text and all of its context. As for context, the Administration would wave away all of the President's express indications that he intends for his Attorney General and Homeland Security Secretary to defund sanctuary cities in order to coerce them to change their policies. The Administration's only response to these express indications of intent is an oblique claim that "[v]arious statements of public officials" "cannot alter the plain meaning of the executive order." Br. 27 (citing *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 329-30 (1994)).

But this Circuit construes the text of an executive order consistently with its "object and policy." *Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005) (internal quotation marks omitted). This Court and others have thus understood executive orders by looking to contemporaneous statements of the presidents who issued them. *See, e.g., Old Dominion Branch No. 496, Nat. Assn. of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 274-75 (1974) (citing president's announcement of executive order); *Bassidji*, 413 F.3d at 935 (citing president's letter to Congress); *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279, 1284 (9th Cir. 1985) (same); *cf. Washington v. Trump*, 847 F.3d at 1165 (in challenge to first

executive order banning entry by citizens of specified Muslim-majority nations, declining to find due process challenge to entry ban by lawful permanent residents moot "in light of the Government's shifting interpretations of the Executive Order"); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 595 (4th Cir.), *vacated as moot*, 138 S. Ct. 353 (2017) (in challenge to first and second executive orders banning entry, looking to "explicit statements of purpose . . . attributable either to President Trump directly or to his advisors").

That approach makes sense: unlike a statute enacted by Congress, which operates only through its text, a president supervises the ongoing work of executive branch officials carrying out his orders, and he has the power to fire officials who do not carry out his orders as he understands them. His statements should give meaning to a court's understanding of his purposes because there can be little doubt that those carrying out his orders will attend to the same statements. *Cf. Cole v. Young*, 351 U.S. 536, 556 (1956) (refusing to give effect to executive order in part on the basis of its continuity with past orders used to persecute suspected Communists; "the Order was promulgated to guide the agency heads in the exercise of the dismissal power [of federal employees with suspect loyalty], and its failure to state explicitly what determinations are required leaves no choice to the agency heads but to follow the most reasonable inferences to be drawn"). *Barclays Bank* does not teach otherwise; the executive branch materials the Court disregarded in that case endorsed a particular commerce policy that Congress declined to adopt. 512 U.S. at 330. Because the Constitution gives preeminence to Congress's enactments on commerce policy, and not the President's, executive branch prescriptions on commerce policy "lack[ed] the force of law." *Id.* at 329, 330. The Court appropriately gave no weight to those materials, which spoke only to the irrelevant question of the executive branch's policy views. *Id.* at 329, 330.

Here, however, the Administration makes no argument that the Executive Order itself is merely hortatory, and *Barclays Bank* offers no guidance about how to interpret an Executive Order that directs action.

As for plain text, the Administration's reading of the text of the Executive Order has two chief flaws. First, perhaps because the Attorney General Memorandum purports to give effect only to the parts of the Order that command the AG and Secretary to withhold federal funds on the basis of noncompliance with § 1373 (*see infra* Section II.), the Administration tries to explain away or ignore the parts of the Order that do not address § 1373 noncompliance. Yet the Order also expressly directs the Attorney General to take enforcement action "against any entity . . . which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law" regardless of whether the entity complies with § 1373, as indicated by the Order's use of the word "or," and the Order does not cabin the discretion of executive branch officials to decide that sanctuary cities are hindering federal immigration enforcement efforts. ER 189 (Order, § 9(a)). And the Administration's brief treats § 9(b) of the Order—requiring the Secretary to compile weekly lists of jurisdictions that have not honored detainers—as an entirely separate command from the defunding mandate, but ignores that § 9(b) deems refusing detainers the act of a "sanctuary jurisdiction[]"—and thus a basis for denying funding pursuant to §§ 2(c) and 9(a). This straightforward reading of the text is consistent with plain statements by the President, the Attorney General, and the Director of ICE that refusing to honor detainer requests is a basis for defunding under the Order. *See supra* at 7-8.

The second chief flaw is the Administration's emphasis on the Order's boilerplate disclaimers of overreach, *i.e.* its savings clauses directing the Attorney General and Secretary to act on the Order only "to the extent permitted by law."

*See* Br. 22-25.  As the district court found, to give effect to these savings clauses would erase the rest of the Order's text, since the Order plainly directs the Attorney General and the Secretary to impose a new "sanctuary jurisdictions" condition on federal grants.  ER 65.  In response to this concern, the Administration explains that it is of no moment that the Order lacks any legal effect and simply directs officials to follow existing law.  Br. 25-26.  That is a very different gloss on savings clauses than the Justice Department gives to the savings clauses that cities like San Francisco often include in their ordinances establishing sanctuary policies:

> The "except as otherwise provided under applicable federal law" provision [which allows local employees to communicate with ICE where provided by federal law], often referred to as a "savings clause," creates a potential ambiguity as to the proper construction of the Chicago ordinance and others like it because to be effective, this "savings clause" would render the ordinance null and void whenever ICE officials requested immigration status information from city employees. Given that the very purpose of the Chicago ordinance, based on our review of its history, was to restrict and largely prohibit the cooperation of city employees with ICE, we have significant questions regarding any actual effect of this "savings clause" and whether city officials consider the ordinance to be null and void in that circumstance.

SER 164.  This is not to say that a savings clause never has effect.  But a savings clause that empties the Order of meaning, and contradicts the ongoing representations of the Administration about the Order's meaning, cannot do the work the Administration would have it do.  The case that the Administration primarily relies on, *Building & Constr. Trades Dept. v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), does not teach otherwise.  The D.C. Circuit in that case rejected a suggestion that the Administration would ignore a savings clause and implement an executive order unlawful because "the present record" did not reveal a prospect of misuse.  *Id.* at 33.  That is not the case here, and the district court did not err in reading the Executive Order as a whole in view of its stated and textual purpose to

impose new restrictions on funding to sanctuary cities to coerce them to change their policies.

The Administration's brief also asks the Court to presume that the Order will be applied only in a lawful manner. Br. 16. This presumption supplies no independent force; it cannot be sustained in the face of the text of the Order and the Administration's ongoing public insistence that sanctuary cities violate federal law and will lose funding if they do not honor detainer requests. In similar vein, *amicus* the Foundation for Moral Law argues that the district court should have applied the canon of constitutional avoidance to save the Executive Order by construing in a constitutional manner. The argument is misplaced. The Supreme Court applies the canon only to statutes and not to executive actions. *F.C.C. v. Fox Tel. Stations, Inc.*, 566 U.S. 502, 516 (2009) ("The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts. We know of no precedent for applying it to limit the scope of authorized executive action.") (internal citation omitted).

There is little reason to apply the canon of constitutional avoidance to executive orders. Unlike with a statute, which is subject to cumbersome and "finely wrought" bicameralism and presentment procedures if Congress chooses to clarify a statute to avoid a constitutional problem, *see INS v. Chadha*, 462 U.S. 919, 951 (1983), the President could clarify or narrow the Order with the stroke of a pen—as he has done repeatedly with his travel ban. *See Hawaii v. Trump*, 878 F.3d 662, 673-74 (9th Cir. 2017), *cert. granted*, No. 17-965 (U.S. Jan. 19, 2018). It speaks volumes that he has not here.

### B.     The Executive Order Is Unlawful.

The Executive Order commands unlawful action three ways.  First, it trespasses on Congress's powers by denying grant money to San Francisco and similarly situated cities based on criteria Congress did not impose.  Second, even if the President possessed the power to impose new conditions on grants, the Order would violate well-established limits on the Spending Clause power, including that the federal government may not impose conditions that violate other constitutional provisions.  Third, the Executive Order attempts specifically to compel jurisdictions to honor ICE detainer requests, a violation of detainees' Fourth Amendment rights and of lower jurisdictions' Tenth Amendment sovereignty— and even the narrow interpretation of the Executive Order that the Administration offers in its briefing to this Court does not foreswear this attempt.

1.     The President's Order is unlawful because it is exclusively within Congress's power, and not the President's, to impose conditions on federal grants.  *See* U.S. Const. art. I, § 8, cl. 1; *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Incident to [the spending power], Congress may attach conditions on the receipt of federal funds . . . .").  Indeed, the President may not repeal or alter the terms of congressional appropriations other than by exercise of his veto power.  *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998).  Where Congress has appropriated federal funds and directed their uses, the President's only duty is to carry out Congress's appropriation.  *Id.*; *see also Train v. City of New York*, 420 U.S. 35, 41 (1975) (federal agency was not authorized to allot to the States less than the amounts authorized by Congress).

Here, the Executive Order purports to direct the Attorney General and the Secretary to deny "federal funds" to sanctuary cities "except as deemed necessary for law enforcement purposes."  ER 189 (Order, § 9(a)).  That the Order does not

specify which funds, or categories of funds, only makes it more ominous, an inference supported by the Order's direction to the Office of Management and Budget to compile a list of "*all* Federal grant money" currently received by sanctuary cities. ER 189 (Order, § 9(c)) (emphasis added). San Francisco receives a wide variety of federal funds, for different programs and under different statutory authorizations, most of which have nothing to do with immigration or law enforcement. *See supra* at 5. Congress has appropriated these funds for specific purposes, and has rejected past proposals calling for restrictions on funding to sanctuary cities. *See, e.g.*, Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016) (as rejected by Senate, Jul. 6, 2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015) (as rejected by Senate, Oct. 20, 2015). Accordingly, the Order's claim of authority to withhold funding, or to dispense it based on an extra-statutory law enforcement criterion, is beyond the President's power. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2084 (2015) (where the President acts in a manner " 'incompatible with the expressed or implied will of Congress,' " he may only do so in an area where the Constitution has assigned him exclusive authority) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

  2. Even if the President had the power to condition the award of federal funds on new criteria, the Order's conditions would violate the Spending Clause. States and local governments have the power under the Tenth Amendment to make their own policy choices, and may not be compelled to regulate by the federal government or commandeered to carry out federal programs. *New York v. United States*, 505 U.S. 144, 161 (1992); *Printz v. United States*, 52 U.S. 898, 919-22 (1997). The federal government, in turn, may use its spending power to encourage jurisdictions to adopt policies by conditioning an award of funds on jurisdictions'

compliance with conditions.  *See Nat. Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2601-03 (2012).  But "[t]he spending power is . . . not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  As the district court recognized, federal conditions must be unambiguous and clearly stated; they must be related to the purpose of the federal program; and the financial inducement cannot be coercive. ER 88.

The condition here—abandon sanctuary policies or lose federal grants— violates all of these restrictions.  Because the President seeks to impose new conditions on federal funds that "currently [are] received," ER 189 (Order, § 9(b)), the Order runs afoul of the restriction that funding conditions must be unambiguously imposed in advance, so that the jurisdiction may "voluntarily and knowingly accept[] the terms of the 'contract' " that the federal government creates by awarding funds.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  "There can, of course, be no knowing acceptance if a State is unaware of the conditions . . . ." *Id.*  The district court correctly concluded that the Order violates the Spending Clause to because it directs the imposition of new, unknown conditions on current grant funds.  ER 23-24.

Federal conditions on the receipt of funds must also be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. at 172. The Executive Order defies that requirement by directing the Attorney General and Secretary to attend to "all Federal grant money" that sanctuary jurisdictions receive.  ER 189 (Order § 9(c)).  San Francisco receives about $800 million per year in multi-year grants, and most of these funds have no conceivable relationship to immigration enforcement. *See supra* at 5; SER 49-55.  Even grant funds that are administered by the Departments of Justice and Homeland Security do not bear an inevitable relationship to immigration enforcement; the Federal Emergency

Management Agency, for example, is a component agency of Homeland Security but immigration enforcement shares no nexus with the disaster relief and emergency preparedness funds that it administers. SER 55; 42 U.S.C. §§ 5121 *et seq*.

Finally, the Executive Order violates the Spending Clause because it threatens a sizeable enough share of San Francisco's budget that it "crosse[s] the line distinguishing encouragement from coercion." *New York v. United States*, 505 US. at 175. In *South Dakota v. Dole*, the prospect of losing 5% of federal highway funds was a noncoercive inducement to States to raise their minimum drinking ages, 483 U.S. at 211, but in *Sebelius*, the threatened loss of Medicaid funds—over 10% of the average State's budget—was "economic dragooning that [left] the States with no real option but to acquiesce," 132 S. Ct. 2604-05. The coercion in this case is larger even than in *Sebelius*: San Francisco receives about a billion dollars every year in federal grants, and 13% of its total budget is federal funds. It is undisputed that the loss of these funds would be catastrophic for San Francisco and the vulnerable people that much of its spending assists. SER 57. This is coercion by any metric.

3.     Independently, the President's effort to compel cities to honor ICE detainer requests by holding people in jails past their release dates is an effort to compel them to violate the Fourth Amendment by holding detainees without probable cause. Federal conditions on local governments' receipt of funds may not violate the Constitution. *Dole*, 483 U.S. at 208; *Lawrence Cty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 269-70 (1985) ("Congress may impose conditions on the receipt of federal funds, absent some independent constitutional bar.").

When a local agency keeps a prisoner in custody past her lawful release date—such as when charges against her are dropped or she completes a short jail sentence—then it subjects the prisoner to a new seizure that must be supported by new probable cause under the Fourth Amendment. *See Morales v. Chadbourne*, 793 F.3d 208, 215-16 (1st Cir. 2015); *Mendia v. Garcia*, 165 F. Supp. 3d 861, 888-89 (N.D. Cal. 2016). But an ICE detainer request, standing alone, does not supply a reasonable belief that a crime has occurred, as needed for probable cause, because ICE detainers demonstrate only ICE's belief that the alien is removable, and not that the detainee has committed a crime. *See* 8 U.S.C. § 1357 (providing authority for warrantless detention by immigration officers with "reason to believe that the alien so arrested is in the United States in violation of any . . . law"); 8 C.F.R. § 287.8(c)(2)(i); *Orellana v. Nobles County*, 230 F. Supp. 3d 934, 945 (D. Minn. 2017). "As a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012). Counties that honor ICE detainer requests and assume that probable cause exists only because ICE seeks the detainee's removal thus risk violating the Fourth Amendment rights of detainees, or being held deliberately indifferent to those rights. *See Morales*, 793 F.3d at 216; *Trulillo-Santoyo v. United States*, No. 5:16-CV-855-OLG, 2017 WL 2896021, at *7 (W.D. Tex. June 5, 2017). That the Order seeks to compel jurisdictions to detain people without a showing of probable cause is an independent basis to invalidate the Order. The spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210.

Moreover, the unlawful action that the Executive Order commands by requiring cities to honor detainer requests in order to receive federal grant funds is not foreclosed even by the artificially narrow reading of the Executive Order that

the Administration offers in its opening brief.  According to that reading, the Order
only requires the Attorney General and the Secretary to withdraw grant funding
from cities that violate § 1373, where they have been given advance notice that a
particular grant requires compliance with § 1373.  Br. 18.  But both the Attorney
General and Acting Director of ICE have publicly maintained that compliance with
§ 1373 or avoiding defunding under the Order requires cities to honor detainer
requests.  *Supra* at 7-8.[3]

For all of these independent reasons, the Executive Order is unlawful.  The
Administration does not contest San Francisco's merits arguments, all of which the
district court relied on in granting summary judgment.  The Administration has
accordingly waived any argument that, if the district court's reading is correct, the
Order is nonetheless lawful.  *See* Fed. R. App. P. 28(a)(8)(A); *see, e.g., Rattlesnake
Coal. v. U.S. E.P.A.*, 509 F.3d 1095, 1100 (9th Cir. 2007) (arguments not
supported in opening brief are waived).

## C. Because The Order Directs Executive Agencies To Take Action Against Cities Like San Francisco, San Francisco's Claims Challenging It Are Justiciable.

The Administration's Article III justiciability argument rests entirely on its
reading of the Executive Order, and the Administration offers no argument that the
district court's standing holding was wrong even if its understanding of the Order
was right.  That implicit concession is correct.  San Francisco has standing to
challenge the Executive Order because, without injunctive relief, it faces a genuine
threat that the Administration will take action to cut off some or all of its federal
grant funding.

---

[3] In oral argument to the district court, the Administration took a different
position, claiming that "[w]e are not arguing that the City is required to hold
someone for 48 hours after their release date."  SER 278.  That claim contradicted
the Attorney General's statements about what § 1373 requires.  SER 7.

A plaintiff has pre-enforcement standing where it faces "a genuine threat of imminent prosecution." *Thomas v. Anchorage Equal Rights Comm.*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (internal quotation marks omitted). "When [a plaintiff] is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007)).

This Circuit has identified three factors that inform whether an enforcement threat is genuine and imminent. The first two are whether the plaintiff has "articulated a 'concrete plan' to violate the law in question" and "whether the prosecuting authorities have communicated a specific . . . threat to initiate proceedings." *Id.* Those two factors are unquestionably satisfied here; San Francisco has enacted local ordinances requiring it not to honor detainer requests, and it generally forbids public employees from assisting with immigration enforcement, although its ordinances contain exceptions. *See supra* at 1-2. And the Administration has clearly communicated its view that San Francisco is a sanctuary jurisdiction subject to retaliation under the Order, and its intent to take action specifically against San Francisco. *See, e.g.,* SER 157-58, 234-35. The third factor under *Thomas* is the history of enforcement under the challenged enactment, 220 F.3d at 1139; that factor is neutral here because San Francisco filed suit only six days after the Order issued.

The Administration also does not argue that San Francisco's claims against the Executive Order, as the district court read it, are prudentially unripe. Nor are they: the question of whether the Administration may withdraw grant funds from San Francisco solely because of its sanctuary policies, and specifically because it does not honor detainer requests, is a purely legal question, and there are no further

facts to ripen on that question. *See Susan B. Anthony List*, 134 S. Ct. at 2347; *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012).

## II. The Attorney General's Post-Litigation Memorandum Does Not Save The Order.

The district court preliminarily enjoined all defendants except the President from enforcing § 9(a) of the Order on April 25, 2017.  ER 100.  On May 22, 2017, the Attorney General issued his Memorandum.  ER 184.  The Administration argues that the Memorandum's construction supplies the only intelligible reading of the Order.  That is wrong for the reasons discussed above.  But even considered as a post-hoc effort to narrow the Order to a constitutional version of itself, the Memorandum does not destroy San Francisco's entitlement to injunctive relief. Under the well-established voluntary cessation doctrine, the Memorandum is neither comprehensive enough nor certain enough to cure the constitutional violations here.

1.      To the extent the Order is considered as a commitment by the Administration to enforce the Order narrowly, it is an ineffective renunciation and does not cure the constitutional violation, and there is reason on this record to believe that the Administration will continue to threaten or carry out unlawful actions if the Court vacates the injunction.

The "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case," and the defendant who claims it has ceased the conduct bears a "heavy" burden of demonstrating that the wrong will not be repeated.  *United States v. W. T. Grant Co.,* 345 U.S. 629, 632 (1953). The defendant must demonstrate that "it is absolutely clear that the allegedly

wrongful behavior could not reasonably be expected to recur." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (internal quotation marks and citation omitted). Courts should be "war[y] of applying mootness under protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015) (internal quotation marks and citations omitted); *see also Native Village of Noatak v. Blatchford*, 38 F.3d 1505, 1511 (9th Cir.) (ceasing challenged action in response to lawsuit weighs against finding mootness). That is especially true for an "internal policy" that simply purports to guide the discretion of administering officers and "was not subject to any procedures that would typically accompany the enactment of a law." *Bell v. City of Boise*, 709 F.3d 890, 900 (9th Cir. 2013). And a defendant's refusal to admit that its prior conduct was illegal is another reason to maintain an injunction even after the offending conduct has stopped, since it raises an inference that the defendant sees no legal bar to resuming the conduct. *See Olagues v. Russoniello*, 770 F.2d 791, 795 (9th Cir. 1985).

Under these principles, the Memorandum does not defeat San Francisco's entitlement to relief. It was issued by the Attorney General after he had been enjoined, apparently in an effort to persuade the district court to lift the injunction. ER 33-34; *Native Village*, 38 F.3d at 1511. He can revoke or amend it, or the President can fire him, and a new Attorney General can adopt a contrary directive. ER 44. The Memorandum is a directive to grantmaking divisions within the Department of Justice, and so even if it binds those divisions that issue DOJ grants, it is not directed to and does not bind the Secretary of Homeland Security or any

other member of the President's cabinet.[4]  The President has not rescinded or amended the Executive Order, despite the ease with which he could do so.

More troubling, the President and the Director of ICE have continued to represent that the Order has a broader meaning than the Memorandum admits.  The day the district court issued its preliminary injunction, the White House issued a statement that "[s]anctuary cities, like San Francisco, block their jails from turning over criminal aliens" and "are engaged in the dangerous and unlawful nullification of Federal law."  SER 158.  In June 2017, in sworn testimony to Congress, the Director of ICE testified that jurisdictions with restrictive policies on jail access and detainer requests were not eligible to receive Justice or Homeland Security Department funding.  SER 209-10.

Indeed, even considering only the Attorney General's statements, and not those of the President or Director of Homeland Security, it is apparent that the constitutional violation remains.  The Attorney General has publicly stated his view that 8 U.S.C. § 1373 requires San Francisco to honor ICE detainer requests:

> Unfortunately, some states and cities have adopted policies designed to frustrate the enforcement of our immigration laws. This includes refusing to detain known felons under federal detainer requests . . . .
>
> . . . .
>
> Not only do these policies endanger the lives of every American; just last May, the Department of Justice Inspector General found that these policies also violate federal law.

---

[4] In proceedings before the district court, the Administration argued that a memorandum of the Attorney General interpreting matters of immigration law is binding on the Department of Homeland Security.  The district court rejected the argument, finding that the Memorandum was an internal DOJ implementation order and not a legal opinion.  ER 43-44.  The Administration does not repeat the argument here, and in fact offers no contention that the Memorandum binds anyone outside of the Justice Department.

SER 234-35.  Thus, when the Memorandum maintains that the only funding condition that will be imposed is compliance with 8 U.S.C. § 1373, what that apparently means includes honoring detainer requests.  That is an unlawful condition, for two reasons.  First, nothing in § 1373 puts local jurisdictions on notice that they must honor detainers to be in compliance with that statute and to avoid losing funds.  *See Pennhurst*, 451 U.S. at 17; *supra* at 18.  Second, under the Spending Clause, Congress may not impose illegal conditions, but honoring detainer requests without regard to whether there is probable cause to believe an immigrant has committed a crime is a Fourth Amendment violation.  *See supra* at 19-20.  Thus, the Executive Order, even as narrowed by the Attorney General's post-litigation interpretation, is unlawful.

2.      *Amici* the States of West Virginia et al. offer an alternative account of the Memorandum.  They contend that San Francisco's facial challenge fails because a facial challenge must demonstrate that each and every application of a challenged enactment is unlawful, and the Memorandum demonstrates that the Order can be lawfully applied to some grants (*i.e.* those where grantees were required to certify their compliance with § 1373).  *Amicus* Br. of W. Va. et al. at 5-9.  That analysis is wrong.  The Order itself claims the power to add new criteria to congressional grants of federal funds in order to compel local jurisdictions to change their policies.  *Supra* at 18.  Such a claim of power always transgresses the President's role under Spending Power and separation of powers cases, regardless of whether the President and Congress sometimes agree about what conditions should be imposed on some grants.  When evaluating a facial challenge, courts consider "only applications of the [law] in which it actually authorizes or prohibits conduct," not instances when it happens to coincide with some other restriction that is not challenged.  *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015).

Moreover, the fact that a lesser official voluntarily agrees to forego exercising all of the power conferred by an unlawful enactment does not destroy a facial challenge, because part of the harm comes from the chilling and intimidating effects of the enactment. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 770 (1988) (in First Amendment facial challenge, refusing to presume that overbroad newspaper permitting ordinance would be applied with narrower standards). For that reason, and because the violation inheres in the enactment itself, courts have declined to credit official promises to apply overbroad laws narrowly. *Id.*; *United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."); *Whitman v. Am. Trucking Assns.*, 531 U.S. 457, 473 (2001) ("The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory."); *United States v. Nosal*, 676 F.3d 854, 862 (9th Cir. 2012) ("The government assures us that, whatever the scope of [the statute], it won't prosecute minor violations. But we shouldn't have to live at the mercy of our local prosecutor.").

Finally, even as to the grants for which the Justice Department has already included a requirement that the grantee certify compliance with § 1373, that is not a lawful application of the Executive Order, because, as just discussed, the Attorney General's interpretation that § 1373 compliance includes honoring detainer requests is an unlawful condition.

## III. The District Court Did Not Abuse Its Discretion In Ordering Relief.

### A. San Francisco Satisfies The Permanent Injunction Factors.

A party seeking a permanent injunction must demonstrate that in the absence of relief, it is likely to suffer irreparable injury that a damages remedy cannot

adequately compensate; that "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and . . . that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The district court did not abuse its discretion in finding that San Francisco satisfied these factors and is entitled to injunctive relief. ER 31.

The Administration contests only the first of the *eBay* factors. It contends that, on the merits, the district court's reading of the Executive Order is incorrect, and that properly read San Francisco will suffer no irreparable harm because the Executive Order does not command any illegal action. It cautions the Court not to enter an order solely to prohibit conduct that the Order does not actually contemplate. Br. 28. But it is undisputed that San Francisco has reserved money in its budget in order to meet the contingency of losing federal grants based on the Order, SER 272, and thus San Francisco has demonstrated that it will suffer ongoing harm if the Administration's threatened sanctions are not enjoined.

The Administration offers no substantiated argument about the remaining factors of the *eBay* test. It is undisputed here that under the district court's understanding of the Order, San Francisco's injuries are irreparable. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The balance of hardships and public interest here also favor San Francisco. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (internal citations and quotation marks omitted). "It is axiomatic that the President must exercise his executive powers lawfully. When there are serious concerns that the President has not done so, the public interest is best served by

'curtailing unlawful executive action.' " *Hawaii v. Trump*, 878 F.3d at 700 (quoting *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided court* 136 S. Ct. 2271 (2016)).

Moreover, in a practical sense the Administration will not suffer if this Court upholds the permanent injunction. In the account of the Administration's brief, it has all of the authority it needs under existing law to impose new grant conditions, and the Executive Order is unnecessary to its designs.[5] As this Circuit has said in another case where the defendants disclaimed that they intended to take action in violation of the law despite evidence to the contrary, "[t]he Defendants cannot be harmed by an order enjoining an action they will not take." *Melendres*, 695 F.3d at 1002. Equitable factors counsel in favor of affirming the injunction.

### B.    The District Court Did Not Abuse Its Discretion In Issuing Nationwide Relief.

"The scope and terms of [a] district court's injunction . . . are reviewed for an abuse of discretion." *Melendres v. Arpaio*, 784 F.3d 1254, 1260 (9th Cir. 2015). Once a district court has determined that the defendant has violated the Constitution, the court "has broad powers to fashion a remedy," and appellate courts must give "deference" to the district court's exercise of those powers. *Sharp v. Weston*, 233 F.3d 1166, 1173, 1174 (9th Cir. 2000). Here, the

---

[5] Indeed, after the injunction was entered in this case, the Department of Justice announced new conditions that it would impose on recipients of certain DOJ grants. These conditions include providing ICE agents access to jails and notifying ICE agents in advance of detainees' release dates. The Department of Justice does not claim that the Executive Order is the source of its authority to impose these conditions. San Francisco is litigating the lawfulness of these conditions in a separate case. *See City & County of San Francisco v. Sessions*, No. 17-4642 (N.D. Cal.).

Administration argues that the district court's nationwide injunction exceeded the limits of Article III and its equitable discretion. Both arguments are incorrect.

1.      There is no Article III principle that limits a district court to entering relief that benefits only the plaintiffs. This Court has squarely held the contrary; "[t]here is no general requirement that an injunction affect only the parties in the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987); *see also id.* at 1170 ("The Supreme Court has held that a federal agency is not necessarily entitled to confine any ruling of a court of appeals to its immediate jurisdiction.") (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). In *Bresgal*, this Court approved "nationwide" injunctive relief requiring the Secretary of Agriculture to reform its application of a worker-protection statute. 843 F.3d at 1171.

The notion that courts lack power under Article III to enjoin a defendant from committing the unlawful conduct at issue in the case anywhere, instead of just as directed at the plaintiffs, would likely surprise the great many courts that have ordered or upheld that very remedy. *See, e.g., Hawaii v. Trump*, 878 F.3d at 701;[6] *Washington v. Trump*, 847 F.3d at 1166 (declining to limit nationwide TRO against first Trump Administration travel ban); *Texas v. United States*, 809 F.3d at 187 ("the Constitution vests the District Court with "the judicial Power of the United States." That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction.") (footnote omitted); *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011) (upholding permanent injunction that applied beyond plaintiffs); *Nat. Mining Assn. v. U.S.*

---

[6] The Supreme Court's order granting certiorari in this case includes the question whether the district court's injunction order is impermissibly overbroad. See Order, *Trump v. Hawaii*, No. 17-965 (Jan. 19, 2018); Pet. for Writ of Cert., *Trump v. Hawaii*, No. 17-965, at I.

*Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("We have made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'") (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *Bresgal*, 843 F.3d at 1171; *Evans v. Harnett Cty. Bd. of Educ.*, 684 F.2d 304, 306 (4th Cir. 1982) ("An injunction warranted by a finding of unlawful discrimination is not prohibited merely because it confers benefits upon individuals who were not plaintiffs or members of a formally certified class."); *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 17 (D.D.C. 2004) (subsequently modified in other respects) (entering nationwide injunction under Administrative Procedure Act); *see also Gregory v. Litton Sys., Inc.,* 472 F.2d 631, 633 (9th Cir. 1972) ("[w]e do not hold or suggest that injunctive relief benefiting nonparties would never be proper unless the court has first invoked Rule 23" but vacating injunction because plaintiff did not request prospective relief).

Indeed, the Supreme Court has acknowledged that a suit by a single individual can alter an entire federal program. *See Lujan v. Nat. Wildlife Fed.*, 497 U.S. 871, 890 n.2 (1990) (Where some "specific order or regulation" adversely affects a plaintiff, "it can of course be challenged under the APA by a person adversely affected—and the entire 'land withdrawal review program,' insofar as the content of that particular action is concerned, would thereby be affected."). Conversely, the Administration's argument that nationwide injunctive relief is only proper where a class is certified is belied by cases where courts have denied class certification under Federal Rule of Civil Procedure 23(b)(2) because class treatment was unnecessary in light of the availability of a nationwide injunction awarded to a single plaintiff. In those cases, courts held, a broad injunction on behalf of the individual plaintiffs would serve the same purposes and be less

cumbersome.  *See M.R. v. Bd. of Sch. Comms. of Mobile Cnty.*, 286 F.R.D. 510,
518 & n.11 (S.D. Ala. 2012) (denying class certification and collecting cases).

The Administration's jurisdictional argument goes astray because it relies on
out-of-context language from cases discussing the very different principle that a
plaintiff must allege an ongoing or likely future injury to have standing to seek
prospective relief.  In *Alvarez v. Smith*, where the plaintiffs sought only prospective
relief to remedy a police agency's seizure practices, but their property had been
returned, the Supreme Court held that the plaintiffs lacked standing to obtain any
remedy.  558 U.S. 87, 92-93 (2009).  And in *Monsanto Co. v. Geertsen Seed
Farms*, 561 U.S. 139, 163 (2010), and *Summers v. Earth Island Institute*, 555 U.S.
488, 494-95 (2009), the Court overturned injunctions that did not remedy any
injury that the plaintiffs were likely to experience.  These cases are applications of
the more general principle that a plaintiff must demonstrate standing separately for
each form of relief sought.  *See Friends of the Earth, Inc. v. Laidlaw
Environmental Services (TOC), Inc.*, 528 U.S. 167, 184 (2000).  But a nationwide
injunction is not a different *form* of relief than a party-specific injunction.  *See, e.g.*
*Melendres*, 784 F.3d at 1265 (breadth of injunctive remedy once a constitutional
violation has been shown is entrusted to district court's discretion).  Accordingly,
where the threat of future injury to San Francisco will assuredly be remedied by a
nationwide injunction, then San Francisco has Article III standing to seek this form
of relief.

The Administration also relies on this Circuit's decision in *Zepeda v. U.S.
Immigration & Naturalization Service*, 753 F.2d 719, 730 n.1 (9th Cir. 1983),
which disapproves nationwide injunctive relief.  But *Bresgal* subsequently
distinguished and narrowed *Zepeda*, on the basis that *Zepeda* involved an
injunction against "an entity that [was] not a party to the suit."  *Id.* at 1170.  The

Administration ignores *Bresgal*'s holding that nationwide injunctive relief can be proper and does not violate Article III.

2.      That is not to say that cases always approve nationwide injunctive relief. But this is a matter of equitable discretion and not of jurisdiction. "Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreax*, 425 U.S. 284, 293-94 (1976) (internal quotation marks and citations omitted). "[T]he scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.,* 402 U.S. 1, 15 (U.S. 1971). "When the court believes the underlying right to be highly significant, it may write injunctive relief as broad as the right itself." *Zamecnik*, 636 F.3d at 879 (internal quotation marks and citation omitted). The Administration argues that nationwide injunctive relief exceeds equitable bounds here, but the reasons it offers—that a nationwide injunction can sometimes forestall litigation in other forums, Br. 33, and gives plaintiffs the benefits of class treatment without its burdens, Br. 34—are not specific to this case and would apply equally to any nationwide injunction entered in any case.

There are four reasons why the district court did not abuse its equitable discretion here. First, the Executive Order—as the President intended it and not as the Memorandum purports to narrow it—was adopted with the egregious intent of using an unconstitutional tool to intimidate sanctuary cities into abandoning their local policy choices. The Administration has never offered a substantive defense of the President's claim of power to impose new grant funding conditions on sanctuary cities. Yet that claim of power was deployed as a "weapon" to intimidate cities into abandoning their policies, SER 229, and is precisely what led

at least one jurisdiction to begin honoring detainer requests to retain funding "[i]n light of the provisions of the Executive Order," SER 238. The district court did not abuse its discretion in applying strong medicine to such a strongarm attempt. Just as the importance of a right matters to the relief courts can award, *see Zamecnik*, 636 F.3d at 879, so too should the willfulness of the constitutional violation.

Second, the treatment of invalid administrative regulations offers guidance here: The Order is akin to an administrative regulation in that it is an action of the Executive Branch that purports to create a national rule. In analogous cases where an administrative regulation is found to overstep the law, the typical remedy is wholesale invalidation of the regulation, not a piecemeal carveout for the plaintiff. *See Bresgal*, 843 F.2d at 1171; *Nat. Mining Assn.*, 145 F.3d at 1409 ("the ordinary result" is that unlawful administrative regulations are "vacated"); *see also Lujan*, 497 U.S. at 890 n.2 (successful challenge by individual plaintiff would affect entire administrative program). The Administration relies on *Los Angeles Haven Hospice, Inc. v. Sebelius*, an administrative law case, but that case concerned a regulation in the Medicare context where the Secretary of Health and Human Services expressed "legitimate and well-founded" concerns about "the uncertainty and confusion that would likely flow from a nationwide injunction" that changed certain Medicare reimbursement formulas. 638 F.3d 644, 665 (9th Cir. 2011). The Administration offers no reason here why uncertainty and confusion would flow from enjoining the invalid Executive Order nationally.

Third, this is not a case where the Administration claims that "several courts [should] pass on a given class claim in order to gain the benefit of adjudication by different courts in different factual contexts." *Califano*, 442 U.S. at 702. There are no facts that matter here. The President cannot insert new, extra-statutory

conditions on congressional appropriations, no matter what a sanctuary city's policies might be.

Finally, and perhaps most importantly, there is no violation here of the equitable maxim that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano*, 442 U.S. at 702. The Administration offers no argument at all that it will be harmed in any respect, or suffer greater burdens, if the nationwide injunction is maintained. (Indeed, as discussed *supra* at 28-29, the Administration offers no argument about the balance of harms at all.) In the Administration's account to the courts—although not to the public and to Congress—the district court enjoined it from breaking the law but left intact all of the lawful power it seeks to exercise. If that is in fact the case, then a nationwide injunction burdens its legitimate interests not at all, and there is no equity-based reason to narrow it.

## CONCLUSION

For the reasons offered above, this Court should affirm the judgment of the district court.

/ / /

/ / /

/ / /

Dated:  February 5, 2018            Respectfully submitted,

DENNIS J. HERRERA
City Attorney
JESSE C. SMITH
RONALD P. FLYNN
YVONNE R. MERÉ
CHRISTINE VAN AKEN
TARA STEELEY
MOLLIE M. LEE
SARA J. EISENBERG
AILEEN M. McGRATH
MATTHEW S. LEE
NEHA GUPTA

Deputy City Attorneys

By:  /s/*Christine Van Aken*
CHRISTINE VAN AKEN
Deputy City Attorney

Attorneys for Plaintiff and Appellee
CITY AND COUNTY OF SAN
FRANCISCO

## STATEMENT OF RELATED CASES

There are no related cases pending in this Court.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief has been prepared using proportionately double-spaced 14 point Times New Roman typeface. According to the "Word Count" feature in my Microsoft Word for Windows software, this brief contains 10,809 words up to and including the signature lines that follow the brief's conclusion.

I declare under penalty of perjury that this Certificate of Compliance is true and correct and that this declaration was executed on February 5, 2018.

<div style="margin-left: 40%;">

DENNIS J. HERRERA
City Attorney
JESSE C. SMITH
RONALD P. FLYNN
YVONNE R. MERÉ
CHRISTINE VAN AKEN
TARA STEELEY
MOLLIE M. LEE
SARA J. EISENBERG
AILEEN M. McGRATH
MATTHEW S. LEE
NEHA GUPTA

Deputy City Attorneys

By: /s/ *Christine Van Aken*
CHRISTINE VAN AKEN
Deputy City Attorney

Attorneys for Plaintiff and Appellee
CITY AND COUNTY OF SAN
FRANCISCO

</div>

# ADDENDUM

# ADDENDUM OF PERTINENT ENACTMENTS

## I.    U.S. Constitution, art. I, § 8 (excerpt)

The Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States;

. . . .

## II.    U.S. Constitution, amend. IV

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## III.    8 U.S.C. § 1357 (excerpt).

(a) Powers without warrant

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant--

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer

of the Service having authority to examine aliens as to their right to enter or remain in the United States;

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;

(4) to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and

(5) to make arrests--

(A) for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

(B) for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony, if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States. The authority to make arrests under paragraph (5)(B) shall only be effective on and after the date on which the Attorney General publishes final regulations which (i) prescribe the categories of officers and employees of the Service who may use force (including deadly force) and the circumstances under which such force may be used, (ii) establish standards with respect to enforcement activities of the Service, (iii) require that any officer or employee of the Service is not authorized to make arrests under paragraph (5)(B) unless the officer or employee has received certification as having completed a training program which covers such arrests and standards described in clause (ii), and (iv) establish an expedited, internal review process for violations of such standards, which process is consistent with standard agency procedure regarding confidentiality of matters related to internal investigations.

. . . .

(c) Search without warrant

Any officer or employee of the Service authorized and designated under regulations prescribed by the Attorney General, whether individually or as one of a class, shall have power to conduct a search, without warrant, of the person, and of the personal effects in the possession of any person seeking admission to the United States, concerning whom such officer or employee may have reasonable cause to suspect that grounds exist for denial of admission to the United States under this chapter which would be disclosed by such search.

. . . .

**IV.    8 U.S.C. § 1373.**

(a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

(c) Obligation to respond to inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**V.    8 C.F.R. § 287.8 (excerpt)**

The following standards for enforcement activities contained in this section must be adhered to by every immigration officer involved in enforcement

activities. Any violation of this section shall be reported to the Office of the Inspector General or such other entity as may be provided for in 8 CFR 287.10.

. . . .

(c) Conduct of arrests—

(1) Authority. Only designated immigration officers are authorized to make an arrest. The list of designated immigration officers may vary depending on the type of arrest as listed in § 287.5(c)(1) through (c)(5).

(2) General procedures.

(i) An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States.

(ii) A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.

. . . .

## VI. San Francisco Administrative Code, Excerpts of Chapter 12H.: Immigration Status

**Sec. 12H.1.  City and County of Refuge**.  It is hereby affirmed that the City and County of San Francisco is a City and County of Refuge.

**Sec. 12H.2.  Use of City Funds Prohibited.**  No department, agency, commission, officer, or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding release status of individuals or any other such personal information as defined in Chapter 12I in the City and County of San Francisco unless such assistance is required by Federal or State

statute, regulation, or court decision. The prohibition set forth in this Chapter 12H shall include, but shall not be limited to:

(a) Assisting or cooperating, in one's official capacity, with any investigation, detention, or arrest procedures, public or clandestine, conducted by the Federal agency charged with enforcement of the Federal immigration law and relating to alleged violations of the civil provisions of the Federal immigration law, except as permitted under Administrative Code Section 12I.3.

(b) Assisting or cooperating, in one's official capacity, with any investigation, surveillance, or gathering of information conducted by foreign governments, except for cooperation related to an alleged violation of City and County, State, or Federal criminal laws.

(c) Requesting information about, or disseminating information, in one's official capacity, regarding the release status of any individual or any other such personal information as defined in Chapter 12I, except as permitted under Administrative Code Section 12I.3, or conditioning the provision of services or benefits by the City and County of San Francisco upon immigration status, except as required by Federal or State statute or regulation, City and County public assistance criteria, or court decision.

(d) Including on any application, questionnaire, or interview form used in relation to benefits, services, or opportunities provided by the City and County of San Francisco any question regarding immigration status other than those required by Federal or State statute, regulation, or court decision.  Any such questions existing or being used by the City and County at the time this Chapter is adopted shall be deleted within sixty days of the adoption of this Chapter.

….

## VII. San Francisco Administrative Code, Excerpts of Chapter 12I: Civil Immigration Detainers

**Sec. 12I.1. Findings**. The City and County of San Francisco (the "City") is home to persons of diverse racial, ethnic, and national backgrounds, including a large immigrant population. The City respects, upholds, and values equal protection and equal treatment for all of our residents, regardless of immigration status. Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all.

The United States Immigration and Customs Enforcement ("ICE") is responsible for enforcing the civil immigration laws. ICE's programs, including Secure Communities and its replacement, the Priority Enforcement Program ("PEP"), seek to enlist local law enforcement's voluntary cooperation and assistance in its enforcement efforts. In its description of PEP, ICE explains that all requests under PEP are for voluntary action and that any request is not an authorization to detain persons at the expense of the federal government. The federal government should not shift the financial burden of federal civil immigration enforcement, including personnel time and costs relating to notification and detention, onto local law enforcement by requesting that local law enforcement agencies continue detaining persons based on non-mandatory civil immigration detainers or cooperating and assisting with requests to notify ICE that

a person will be released from local custody. It is not a wise and effective use of valuable City resources at a time when vital services are being cut.

ICE's Secure Communities program (also known as "S-Comm") shifted the burden of federal civil immigration enforcement onto local law enforcement. S-Comm came into operation after the state sent fingerprints that state and local law enforcement agencies had transmitted to the California Department of Justice ("Cal DOJ") to positively identify the arrestees and to check their criminal history. The FBI would forward the fingerprints to the Department of Homeland Security ("DHS") to be checked against immigration and other databases. To give itself time to take a detainee into immigration custody, ICE would send an Immigration Detainer – Notice of Action (DHS Form I-247) to the local law enforcement official requesting that the local law enforcement official hold the individual for up to 48 hours after that individual would otherwise be released ("civil immigration detainers"). Civil Immigration detainers may be issued without evidentiary support or probable cause by border patrol agents, aircraft pilots, special agents, deportation officers, immigration inspectors, and immigration adjudication officers.

Given that civil immigration detainers are issued by immigration officers without judicial oversight, and the regulation authorizing civil immigration detainers provides no minimum standard of proof for their issuance, there are serious questions as to their constitutionality. Unlike criminal warrants, which must be supported by probable cause and issued by a neutral magistrate, there are no such requirements for the issuance of a civil immigration detainer. Several federal courts have ruled that because civil immigration detainers and other ICE "Notice of Action" documents are issued without probable cause of criminal conduct, they do not meet the Fourth Amendment requirements for state or local

law enforcement officials to arrest and hold an individual in custody. (*Miranda-Olivares v. Clackamas Co*., No. 3:12-cv-02317-ST *17 (D.Or. April 11, 2014) (finding that detention pursuant to an immigration detainer is a seizure that must comport with the Fourth Amendment). *See also Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I 2014); *Villars v. Kubiatowski*, No. 12-cv-4586 *10-12 (N.D. Ill. filed May 5, 2014).)

On December 4, 2012, the Attorney General of California, Kamala Harris, clarified the responsibilities of local law enforcement agencies under S-Comm. The Attorney General clarified that S-Comm did not require state or local law enforcement officials to determine an individual's immigration status or to enforce federal immigration laws. The Attorney General also clarified that civil immigration detainers are voluntary requests to local law enforcement agencies that do not mandate compliance. California local law enforcement agencies may determine on their own whether to comply with non-mandatory civil immigration detainers. In a June 25, 2014, bulletin, the Attorney General warned that a federal court outside of California had held a county liable for damages where it voluntarily complied with an ICE request to detain an individual, and the individual was otherwise eligible for release and that local law enforcement agencies may also be held liable for such conduct. Over 350 jurisdictions, including Washington, D.C., Cook County, Illinois, and many of California's 58 counties, have already acknowledged the discretionary nature of civil immigration detainers and are declining to hold people in their jails for the additional 48 hours as requested by ICE. Local law enforcement agencies' responsibilities, duties, and powers are regulated by state law. However, complying with non-mandatory civil immigration detainers frequently raises due process concerns.

According to Section 287.7 of Title 8 of the Code of Federal Regulations, the City is not reimbursed by the federal government for the costs associated with civil immigration detainers alone. The full cost of responding to a civil immigration detainer can include, but is not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer. Compliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City.

The City seeks to protect public safety, which is founded on trust and cooperation of community residents and local law enforcement. However, civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies. A 2013 study by the University of Illinois, entitled "Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement," found that at least 40% of Latinos surveyed are less likely to provide information to police because they fear exposing themselves, family, or friends to a risk of deportation. Indeed, civil immigration detainers have resulted in the transfer of victims of crime, including domestic violence victims, to ICE.

The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies.

In 2014, DHS ended the Secure Communities program and replaced it with PEP. PEP and S-Comm share many similarities. Just as with S-Comm, PEP uses

state and federal databases to check an individual's fingerprints against immigration and other databases. PEP employs a number of tactics to facilitate transfers of individuals from local jails to immigration custody.

First, PEP uses a new form (known as DHS Form I-247N), which requests notification from local jails about an individual's release date prior to his or her release from local custody. As with civil immigration detainers, these notification requests are issued by immigration officers without judicial oversight, thus raising questions about local law enforcement's liability for constitutional violations if any person is overdetained when immigration agents are unable to be present at the time of the person's release from local custody.

Second, under PEP, ICE will continue to issue civil immigration detainer requests where local law enforcement officials are willing to respond to the requests, and in instances of "special circumstances," a term that has yet to be defined by DHS. Despite federal courts finding civil immigration detainers do not meet Fourth Amendment requirements, local jurisdictions are often unable to confirm whether or not a detention request is supported by probable cause or has been reviewed by a neutral magistrate.

The increase in information-sharing between local law enforcement and immigration officials raises serious concerns about privacy rights. Across the country, including in the California Central Valley, there has been an increase of ICE agents stationed in jails, who often have unrestricted access to jail databases, booking logs, and other documents that contain personal information of all jail inmates.

The City has an interest in ensuring that confidential information collected in the course of carrying out its municipal functions, including but not limited to public health programs and criminal investigations, is not used for unintended

purposes that could hamper collection of information vital to those functions. To carry out public health programs, the City must be able to reliably collect confidential information from all residents. To solve crimes and protect the public, local law enforcement depends on the cooperation of all City residents. Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody.

In late 2015, Pedro Figueroa, an immigrant father of an 8-year-old U.S. citizen, sought the San Francisco Police Department's help in locating his stolen vehicle. When Mr. Figueroa went to the police station to retrieve his car, which police had located, he was detained for some time by police officers before being released, and an ICE agent was waiting to take him into immigration custody immediately as he left the police station. It was later reported that both the Police Department and the San Francisco Sheriff's Department had contact with ICE officials while Mr. Figueroa was at the police station. He spent over two months in an immigration detention facility and remains in deportation proceedings. Mr. Figueroa's case has raised major concerns about local law enforcement's relationship with immigration authorities, and has weakened the immigrant community's confidence in policing practices. Community cooperation with local law enforcement is critical to investigating and prosecuting crimes. Without the cooperation of crime victims – like Mr. Figueroa – and witnesses, local law enforcement's ability to investigate and prosecute crime, particularly in communities with large immigrant populations, will be seriously compromised.

**Sec. 12I.2.  Definitions**.

"Administrative warrant" means a document issued by the federal agency charged with the enforcement of the Federal immigration law that is used as a non-criminal, civil warrant for immigration purposes.

"Eligible for release from custody" means that the individual may be released from custody because one of the following conditions has occurred:

(a) All criminal charges against the individual have been dropped or dismissed.

(b) The individual has been acquitted of all criminal charges filed against him or her.

(c) The individual has served all the time required for his or her sentence.

(d) The individual has posted a bond, or has been released on his or her own recognizance.

(e) The individual has been referred to pre-trial diversion services.

(f) The individual is otherwise eligible for release under state or local law.

"Civil immigration detainer" means a non-mandatory request issued by an authorized federal immigration officer under Section 287.7 of Title 8 of the Code of Federal Regulations, to a local law enforcement official to maintain custody of an individual for a period not to exceed 48 hours and advise the authorized federal immigration officer prior to the release of that individual.

"Convicted" means the state of having been proved guilty in a judicial proceeding, unless the convictions have been expunged or vacated pursuant to applicable law. The date that an individual is Convicted starts from the date of release.

"Firearm" means a device, designed to be used as a weapon, from which expelled through a barrel, a projectile by the force of an explosion or other form of combustion as defined in Penal Code Section 16520.

"Law enforcement official" means any City Department or officer or employee of a City Department, authorized to enforce criminal statutes, regulations, or local ordinances; operate jails or maintain custody of individuals in

jails; and operate juvenile detention facilities or maintain custody of individuals in juvenile detention facilities.

"Notification request" means a non-mandatory request issued by an authorized federal immigration officer to a local law enforcement official asking for notification to the authorized immigration officer of an individual's release from local custody prior to the release of an individual from local custody. Notification requests may also include informal requests for release information by the Federal agency charged with enforcement of the Federal immigration law.

"Personal information" means any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information.

"Serious Felony" means all serious felonies listed under Penal Code Section 1192.7(c) that also are defined as violent felonies under Penal Code Section 667.5(c); rape as defined in Penal Code Sections 261, and 262; exploding a destructive device with intent to injure as defined in Penal Code Section 18740; assault on a person with caustic chemicals or flammable substances as defined in Penal Code Section 244; shooting from a vehicle at a person outside the vehicle or with great bodily injury as defined in Penal Code Sections 26100(c) and (d).

"Violent Felony" means any crime listed in Penal Code Section 667.5(c); human trafficking as defined in Penal Code Section 236.1; felony assault with a deadly weapon as defined in Penal Code Section 245; any crime involving use of a firearm, assault weapon, machine gun, or .50 BMG rifle, while committing or attempting to commit a felony that is charged as a sentencing enhancement as listed in Penal Code Sections 12022.4 and 12022.5.

**Sec. 12I.3. Restrictions on Law Enforcement Officials.**

(a) Except as provided in subsection (b), a law enforcement official shall not detain an individual on the basis of a civil immigration detainer after that individual becomes eligible for release from custody.

(b) Law enforcement officials may continue to detain an individual in response to a civil immigration detainer for up to 48 hours after that individual becomes eligible for release if the continued detention is consistent with state and federal law, and the individual meets both of the following criteria:

(1) The individual has been Convicted of a Violent Felony in the seven years immediately prior to the date of the civil immigration detainer; and

(2) A magistrate has determined that there is probable cause to believe the individual is guilty of a Violent Felony and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to continue to detain an individual based solely on a civil immigration detainer as permitted in this subsection (b), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to: the individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

This subsection (b) shall expire by operation of law on October 1, 2016, or upon a resolution passed by the Board of Supervisors that finds for purposes of this Chapter, the federal government has enacted comprehensive immigration reform that diminishes the need for this subsection (b), whichever comes first.

(c) Except as provided in subsection (d), a law enforcement official shall not respond to a federal immigration officer's notification request.

(d) Law Enforcement officials may respond to a federal immigration officer's notification request if the individual meets both of the following criteria:

(1) The individual either:

(A) has been Convicted of a Violent Felony in the seven years immediately prior to the date of the notification request; or

(B) has been Convicted of a Serious Felony in the five years immediately prior to the date of the notification request; or

(C) has been Convicted of three felonies identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, arising out of three separate incidents in the five years immediately prior to the date of the notification request; and

(2) A magistrate has determined that there is probable cause to believe the individual is guilty of a felony identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to respond to a notification request as permitted by this subsection (d), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to, the individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

(e) Law enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws.

(f) Law enforcement officials shall make good faith efforts to seek federal reimbursement for all costs incurred in continuing to detain an individual, after that individual becomes eligible for release, in response each civil immigration detainer.

**Sec. 12I.4. Purpose of This Chapter.**  The intent of this Chapter 12I is to address requests for non-mandatory civil immigration detainers, voluntary notification of release of individuals, transmission of personal information, and civil immigration documents based solely on alleged violations of the civil provisions of immigration laws.  Nothing in this Chapter shall be construed to apply to matters other than those relating to federal civil immigration detainers, notification of release of individuals, transmission of personal information, or civil immigration documents, based solely on alleged violations of the civil provisions of immigration laws. In all other respects, local law enforcement agencies may continue to collaborate with federal authorities to protect public safety. This collaboration includes, but is not limited to, participation in joint criminal investigations that are permitted under local policy or applicable city or state law.

….

# CERTIFICATE OF SERVICE

I, Pamela Cheeseborough, hereby certify that I electronically filed the following document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECFsystem on February 5, 2018.

## ANSWERING BRIEF OF APPELLEE CITY AND COUNTY OF SAN FRANCISCO

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed February 5, 2018, at San Francisco, California.


*/s/ Pamela Cheeseborough*
Pamela Cheeseborough